**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SHAWN SHANAWAZ, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | Case No. 1:17-cv-05761-JPO |
| | ) | |
| INTELLIPHARMACEUTICS INTERNATIONAL INC., ISA ODIDI and DOMENIC DELLA PENNA, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND**
**APPOINTMENT OF CLASS COUNSEL**

**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
J. Ryan Lopatka (*admitted PHV*)
250 Park Avenue, Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

-and-

Lewis S. Kahn
Craig J. Geraci, Jr. (*admitted PHV*)
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Lead Counsel for Lead Plaintiffs*
*and the Class and Proposed Class Counsel*

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................ 1

II.  STATEMENT OF FACTS ............................................................................................. 2

III. ARGUMENT .................................................................................................................. 4

   A.   Plaintiffs' Claims Are Well-Suited for Class Treatment ......................................... 4

   B.   The Proposed Class Satisfies the Requirements of FED. R. CIV. P. 23(a) ......................... 5

      1.   The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable ... 5

      2.   Questions of Law or Fact Are Common to the Class ..................................................... 6

      3.   Plaintiffs' Claims Are Typical of the Class .................................................................. 7

      4.   Representative Parties Will Fairly and Adequately Protect the Interests of the Class ... 7

   C.   The Proposed Class Satisfies FED. R. CIV. P. 23(b)(3) .................................................... 8

      1.   Common Questions of Law and Fact Predominate ....................................................... 9

      2.   The Presumption of Reliance Applies .......................................................................... 9

      3.   Defendants Cannot Meet Their Burden to Demonstrate Lack of Price Impact ............ 15

      4.   Damages Are Capable of Classwide Determination ..................................................... 16

      5.   A Class Action Is the Superior Method for Adjudicating the Controversy ................. 16

   D.   KSF Satisfies FED. R. CIV. P. 23(g) .............................................................................. 17

IV.  CONCLUSION ............................................................................................................. 18

Lead Plaintiffs David Ducharme, Sam Snyder, and Julia Ann Snyder (collectively, "Plaintiffs") submit this memorandum in support of their Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel pursuant to FED. R. CIV. P. 23, and seek an order certifying the following Class:

> All those who purchased or otherwise acquired the common stock of Intellipharmaceutics International Inc. ("IPCI or the "Company") on the NASDAQ during the period from November 25, 2016 through and including July 26, 2017 (the "Class Period"), excluding Defendants, officers, and directors of IPCI, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

Plaintiffs also move the Court to appoint themselves and Vianey Manriquez ("Manriquez") as Class Representatives and to appoint Kahn Swick & Foti, LLC ("KSF") as Class Counsel.

## I.    INTRODUCTION

Plaintiffs' claims are perfectly suited for class certification. Plaintiffs were injured by the same course of conduct as all other Class members: Defendants' material misrepresentations made to the market as a whole concerning the contents and scope of a New Drug Application ("NDA") for Rexista. Proving these claims at trial will also focus on issues and evidence common to all Class members: falsity, reliance, materiality, scienter, and loss causation.

Because such common issues generally predominate in securities cases, and because class adjudication is the only meaningful recourse for most investors, courts have long recognized that "class action treatment is 'particularly appropriate when plaintiffs seek redress for violations of the securities laws.'" *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 519 (S.D.N.Y. 2018) (quoting *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999)); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997) ("Predominance is a test readily met in certain cases alleging . . . securities fraud"). This case is no exception. As detailed below, the proposed Class

satisfies the requirements for certification under Rule 23(a) and Rule 23(b)(3). Thus, class certification should be granted.

## II.    STATEMENT OF FACTS

IPCI is a pharmaceutical company purportedly engaged in the research, development, and commercialization of controlled-release and targeted pharmaceutical products, both novel and generic, with a particular emphasis in the opioid abuse deterrence space. ¶26.[1] During the Class Period, IPCI's primary product candidate was Rexista, a purported abuse-deterrent opioid tablet. ¶27. This action arises from Defendants' material misrepresentations regarding the contents and scope of IPCI's NDA for Rexista. ¶¶95, 97, 100, 103, 107, 110. Plaintiffs, Manriquez, and all other members of the proposed Class were injured by this common course of conduct because they purchased or otherwise acquired IPCI common stock at inflated prices during the Class Period. *See* Plaintiffs' Certifications at ECF Nos. ¶17-1 and Declaration of Kim E. Miller ("Miller Decl.") at Exhibit A; *see also* ¶¶18-20, 149-53, 155-60.

As a result of the opioid crisis, in April 2015, the U.S. Food and Drug Administration ("FDA") issued final guidance, entitled "Abuse-Deterrent Opioids – Evaluation and Labeling," to assist the pharmaceutical industry in developing new formulations of opioid drugs with abuse-deterrent properties (the "FDA Guidance"). ¶32. In order to obtain FDA approval, the FDA Guidance recommends three particular categories of studies to manufacturers seeking to "obtain a full and scientifically rigorous understanding of the impact of a technology or technologies on a product's abuse potential." ¶34. The three categories of recommended studies are: (i) laboratory-based in vitro manipulation and extraction studies ("Category 1 studies"), designed to evaluate the ease with which a drug can be manipulated to evade its abuse-deterrent properties; (ii)

---

[1] "¶__" citations refer to allegations in the operative Complaint (ECF No. 25).

pharmacokinetic studies ("Category 2 studies"), designed to evaluate the varying ways the drug would be processed by the user's body when taken intact or in manipulated form and in comparison with other drugs; and (iii) clinical abuse potential studies ("Category 3 studies"), designed to assess the impact of the drug's abuse-deterrent properties on actual using populations. ¶¶35–36. While the FDA Guidance only constitutes a general "recommendation" to sponsors, the FDA advised IPCI to follow the FDA Guidance in meetings with the Company before IPCI filed the Rexista NDA. ¶58.

On November 25, 2016, the start of the Class Period, IPCI announced that it filed an NDA for Rexista and assured investors that "[t]he [NDA] submission [included] a comprehensive array of abuse-deterrent studies conducted to support abuse-deterrent label claims related to abuse of drug by oral, intra-nasal and intravenous pathways, having reference to the [FDA Guidance]." ¶44. Throughout the Class Period, Defendants continued to make similar statements regarding the contents and scope of the Rexista NDA. ¶¶97, 100, 103, 107, 110. These statements naturally led investors to believe that: (1) the "comprehensive array of abuse-deterrent studies" to support abuse-deterrent claims for three routes of abuse included more than just Category 1 studies; (2) the Rexista NDA was submitted in line with the FDA Guidance; and (3) IPCI was seeking abuse-deterrent labeling claims for all three routes of abuse (not just intravenous).

These statements, however, were directly contradicted by the true contents of the Rexista NDA, and the true facts were ultimately revealed to investors on July 24 and 27, 2017, dissipating the artificial inflation in IPCI's stock price. *See*, *e.g.*, ¶¶96, 112-15. Specifically, on July 24, 2017, the FDA published background materials in advance of the June 26 FDA Advisory Committee meeting to review the Rexista NDA. ¶50. These materials publicly revealed for the first time that, despite representations to the contrary, IPCI submitted *only* Category 1 studies to support labeling

for abuse-deterrent properties *only* for the IV route of abuse (and not also for nasal and oral routes of abuse). *See id.* As a result of these partial revelations of the true facts, the price of shares of IPCI's common stock fell 14%. *See* ¶113.

Two days later, on July 26, 2017, the FDA Advisory Committee convened to review the Rexista NDA voted overwhelmingly against its approval, largely due to the NDA's noncompliance with the FDA's Guidance. ¶¶56–57. The next day, before the market opened, IPCI issued a press release advising investors of the devastating outcome of the FDA Advisory Committee meeting. ¶114. As a result of these revelations, the price of shares of IPCI's common stock again fell sharply, this time by more than 45%. *Id.*

## III.   ARGUMENT

### A.   Plaintiffs' Claims Are Well-Suited for Class Treatment

The Supreme Court has repeatedly stressed the importance of the class action device in redressing the wrongs committed under federal securities laws. *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1201 (2013); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 n.4 (2007); *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Likewise, "the Second Circuit 'has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation and has explicitly noted its preference for class certification in securities cases.'" *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *35 (S.D.N.Y. July 27, 2007) (quoting *In re Nortel Networks Corp. Sec. Litig.*, No. 01-cv-1855, 2003 U.S. Dist. LEXIS 15702, at *2 (S.D.N.Y. Sept. 8, 2003)).

To obtain certification, Plaintiffs must satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Amchem*, 521 U.S. at 613-14. In addition, Plaintiffs must satisfy one of the subsections of Rule 23(b). *Id.* at 614. Here,

4

Plaintiffs seek to certify a class under Rule 23(b)(3) because "the questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *see Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), that does not give the Court "license to engage in free-ranging merits inquiries at the class certification stage," *Amgen*, 133 S. Ct. at 1194-95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. at 1195. Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not proper to delve into merits issues such as falsity, materiality, scienter, loss causation, or damages. *See, e.g.*, *Erica P. John Fund v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *see also Amgen*, 133 S. Ct. at 1193-94.

## B.    The Proposed Class Satisfies the Requirements of FED. R. CIV. P. 23(a)

### 1.    The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable

To satisfy the numerosity requirement of Rule 23(a)(1), Plaintiffs must establish that "the class is so numerous that joinder of all members is impracticable." *See* FED. R. CIV. P. 23(a)(1). "While no minimum number of plaintiffs is required for a suit to be maintained as a class action, '[g]enerally, courts will find a class sufficiently numerous when it comprises 40 or more members.'" *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 237 (S.D.N.Y. 2006) (citation omitted). "Precise quantification of the class members is not necessary because a court may make common sense assumptions regarding numerosity." *Id.* In securities actions involving

nationally-listed public companies, numerosity "may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007).

Here, Plaintiffs believe there are thousands of geographically dispersed Class members. Throughout the Class Period, IPCI was listed on the NASDAQ, where it traded, on average, 133.2 thousand shares weekly with approximately 3 million shares outstanding. *See* Market Efficiency Report of Chad W. Coffman, CFA ("Coffman Report") at ¶25, Miller Decl. at Ex. D. Therefore, Rule 23(a)(1) is satisfied.

### 2.      Questions of Law or Fact Are Common to the Class

The commonality requirement is met where, as here, there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). "Even a single common question will do," *Wal-Mart*, 131 at 2562, and Rule 23(a)(2) is a "low hurdle" that is "easily surmounted," *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995).

As in most securities class actions, trial here will focus on "common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages." *La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 11-cv-289, 2017 U.S. Dist. LEXIS 113758, at *11 (D. Vt. July 21, 2017); *see also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 91 (S.D.N.Y. 2018) (Oetken, J.) ("The legal questions turn almost exclusively on Och-Ziff's conduct and are therefore common across the class."). Each Class member was injured as a result of common misrepresentations concerning the content and scope of the Rexista NDA and impacted by disclosures affecting equally all market participants transacting in IPCI shares. Furthermore, the legal claims asserted by Plaintiffs are common to all

proposed Class members, *see* ¶159, and the evidence Plaintiffs will employ to prove those claims will be common to all Class members. Commonality is easily satisfied.

### 3.      Plaintiffs' Claims Are Typical of the Class

In securities cases, typicality is "not demanding." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-cv-5310, 2016 U.S. Dist. LEXIS 153804, at *13 (S.D.N.Y. Nov. 4, 2016). "Rule 23(a)(3) is satisfied by a showing that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.* (citation omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id*. (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)).

Plaintiffs' claims are typical because both Plaintiffs and absent Class members were injured by the same common course of conduct by Defendants—misrepresentations concerning the content and scope of the Rexista NDA—and all assert violations of the same statutes based upon the same nucleus of facts. Thus, Plaintiffs stand in precisely the same position as absent Class members.

### 4.      The Representative Parties Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is also met here. Adequacy assesses "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 117 S. Ct. at 2250

(citation omitted). Only a "fundamental" conflict will affect adequacy. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted). Minor or speculative conflicts "should be disregarded at the class certification stage." *Id.*

Both elements of the adequacy requirement are easily satisfied here. Plaintiffs "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 117 S. Ct. at 2250-51, and have no conflicts with absent Class members. Furthermore, proposed Class Counsel is highly qualified. KSF has routinely served as lead counsel in securities class actions in federal courts across the country, and has won substantial recoveries for classes represented by the firm in securities class actions and other complex litigation. *See* Miller Decl. at Ex. B. For example, KSF served as co-class counsel in *Erica P. John Fund, Inc. v. Halliburton Co., et al.*, No. 02-cv-1152 (N.D. Tex.), a case that resulted in a $100 million settlement after two trips to the Supreme Court on class certification issues.

Finally, the record demonstrates that Plaintiffs and their counsel have zealously advanced the Class's interests. Plaintiffs defeated Defendants' motion to dismiss (ECF No. 35) and have now begun pursuing relevant discovery and gathering evidence that will benefit the Class at trial. Thus, Rule 23(a)(4) is satisfied.

### C.   The Proposed Class Satisfies FED. R. CIV. P. 23(b)(3)

This case also satisfies Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

### 1.      Common Questions of Law and Fact Predominate

"Predominance is a test readily met in certain cases alleging … securities fraud . . . ." *Amchem*, 117 S. Ct. at 2250. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (internal quotation marks omitted).

### 2.      The Presumption of Reliance Applies

The predominance test is easily met here because IPCI traded in an efficient market, allowing the presumption that Plaintiffs and all other Class members "relied on public, material misrepresentations regarding those securities." *Amgen*, 133 S. Ct. at 1192. Under the fraud-on-the-market doctrine, plaintiffs are entitled to a rebuttable presumption of reliance if they demonstrate, by a preponderance of the evidence: (1) that the alleged misrepresentations were public; (2) that the stock traded in an efficient market; and (3) that plaintiffs traded the stock between when the misrepresentations were made and before the truth was fully revealed (*i.e.*, market timing). *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) (*Halliburton II*).[2] Plaintiffs have established each of these requirements.

#### a.      Plaintiffs Purchased Shares While IPCI Stock Price Was Inflated by Public Misrepresentations

Plaintiffs and Manriquez affirmed that they bought IPCI stock between when the misrepresentations were made and when the truth was fully revealed and seek to represent a Class

---

[2] "Even though materiality is a prerequisite for invoking the *Basic* presumption, [the Supreme Court] held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 134 S. Ct. at 2416. The Supreme Court has also held that a plaintiff need not make any showing of loss causation to invoke *Basic*'s presumption at the class certification stage. *See id*. at 2406.

of investors who purchased during that same time period. *See* Certifications at ECF Nos. 17-1 and Miller Decl. at Ex. A; *see also* ¶¶18-20. Moreover, each alleged misrepresentation was public. *See* ¶¶95, 97, 100, 103, 107, 110.

### b.    IPCI Stock Traded on an Efficient Market

IPCI stock traded on an efficient market during the Class Period. Initially, the stock was listed on the NASDAQ, and this listing alone warrants a presumption that the market for IPCI stock was efficient. *See, e.g., Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016), *aff'd sub nom., Waggoner v. Barclays PLC*, 875 F.3d 79, 98-99 (2d Cir. 2017); *Wagner v. Barrick Gold Corp.,* 251 F.R.D. 112, 119 (S.D.N.Y. 2008) ("And, if 'a security is listed on the NYSE . . . or a similar national market, the market for that security is presumed to be efficient.'"); *In re Initial Pub. Offering Secs. Litig*., 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency.").

In addition, a review of the factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) confirm IPCI traded in an efficient market. These factors may be considered as indicia of market efficiency. *See*, *e.g.*, *Waggoner*, 875 F.3d at 94-98. Plaintiffs also submit the expert report of Chad W. Coffman, which assesses each of the direct and indirect tests identified in *Cammer* and *Krogman*, as well as considers two additional factors that support market efficiency. *See* Coffman Report (Ex. D) at ¶¶23-75. In sum, after reviewing all of the relevant market efficiency factors, Coffman determined that IPCI common stock traded in an efficient market during the Class Period. *See id*. at ¶78.

### (i)    *Cammer* Factor One: High Weekly Trading Volume

The first *Cammer* factor—high weekly trading volume—suggests efficiency "because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Strougo*, 312 F.R.D. at 316 (quoting *Cammer*, 711 F. Supp. at 1286). "*Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency, while turnover of one percent would justify a substantial presumption." *Id*. (citing *Cammer*, 711 F. Supp. at 1286). Here, average weekly trading volume during the Class Period for IPCI's common stock was approximately 133.2 thousand shares, or 4.43% of the shares of IPCI's common stock outstanding, compared to 1.85% for the NYSE and NASDAQ, and ***more than double*** the volume warranting a strong presumption of efficiency under *Cammer*. *See* Coffman Report (Ex. D) at ¶28.

Additionally, the annualized turnover velocity ratio for IPCI stock was 221% compared with the NYSE and NASDAQ combined average of 97% for the Class Period. *Id*. at ¶29. Turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (*i.e.*, shares outstanding multiplied by price per share), and the advantage of this measure is that once quoted in annualized terms, IPCI's common stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. *Id*.

### (ii)    *Cammer* Factor Two: Analyst Coverage

Second, "*Cammer* recognizes that a stock covered by a 'significant number of analysts' is more likely to be efficient because such coverage implies that investment professionals are following the company and taking buy/sell recommendations to investors." *Strougo*, 312 F.R.D.

at 316 (citing *Cammer*, 711 F. Supp. at 1286). *Cammer* did not identify the number of analysts that would be considered "significant," but the declaration submitted in that case proffered evidence that five firms issued at least 15 research reports during the class period. *See* Poser Declaration in *Cammer* at ¶28, Miller Decl. at Ex. C. Here, IPCI stock was covered by analysts from at least 12 securities firms during the Class Period, who contributed at least 74 reports covering IPCI. *See* Coffman Report (Ex. D) at ¶33. Moreover, during the Class Period, there were at least 289 unique articles classified as related to IPCI. *Id.* at ¶35. Thus, this factor strongly supports a finding of market efficiency.

### (iii)     *Cammer* Factor Three: Market-Makers and Arbitrage

Third, the existence of numerous market makers is further evidence of market efficiency because the "existence of market makers . . . ensure[s] completion of the market mechanism." *Cammer*, 711 F. Supp. at 1286-87. During the Class Period, there were 38 market makers for shares of IPCI's common stock. *See* Coffman Report (Ex. D) at ¶41. This is further evidence that IPCI stock traded on an efficient market. *See id.*; *see also McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 432 (S.D.N.Y. 2014) (holding that an average of 20 market makers, and citing cases where as few as six market makers, supported market efficiency).

### (iv)     *Cammer* Factor Four: Form S-3 Eligibility

Fourth, "the existence of Form S-3 [or Form F-3 with respect to foreign issuers] status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. This element is important because "[t]he SEC permits a company to file Form S-3 when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information." *Strougo*, 312 F.R.D. at 316 (citing *Cammer*, 711 F. Supp. at 1284). Here, IPCI was eligible to file Form F-3. *See* Coffman Report (Ex. D) at ¶44. In fact, during the Class

Period, IPCI filed a Form F-3 on May 26, 2017. *See id*. Thus, the fourth *Cammer* factor supports a finding of market efficiency.

**(v)      *Cammer* Factor Five: Cause and Effect Relationship**

Fifth, because there is overwhelming indirect evidence of market efficiency, the Court need not even "consider whether [Plaintiffs] have also satisfied *Cammer* 5 by proof of an event study." *Strougo,* 312 F.R.D. at 323. "[I]ndirect evidence . . . will typically be sufficient to satisfy the *Basic* presumption on class certification." *Id.* Affirming *Strougo*, the Second Circuit agreed "that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies." *Waggoner*, 875 F.3d at 97-99[3]; *see also Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 n.3 (S.D.N.Y. 2018) ("As Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor[.]").

Nonetheless, Plaintiffs submit a thorough, reliable event study that unquestionably confirms a cause and effect relationship between the release of value-relevant, company-specific information, and movements in IPCI's stock price. *See* Coffman Report (Ex. D) at ¶¶45-64. "An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities." *Id.* at ¶47. Consistent with established industry practice, Coffman examined the responsiveness of IPCI's common share price to material news events and, after adjusting for market and industry effects, performed a regression to determine whether those movements were statistically significant relative to movements observed during a control period. *Id.* at ¶¶46-50.[4] Coffman concluded that there was a clear cause-and-effect relationship between

---

[3] On April 30, 2018, the Supreme Court denied a petition for writ of certiorari that asked the Court to reject *Waggoner* and to consider "[w]hether plaintiffs may invoke the fraud-on-the-market presumption without direct evidence that the price of the security responded to new, material information during the class period." *See Barclays PLC v. Waggoner,* 138 S. Ct. 1702 (2018).

[4] Notably, the examination performed by Coffman was more rigorous and scientific than the one submitted in *Cammer*, which addressed only anecdotal evidence of stock movement on a single news date. *See* Miller Decl. at Ex. C, ¶33.

new material news and changes in the market price of IPCI stock during the Class Period. *See id*. at ¶48. Accordingly, this factor is satisfied and weighs heavily in favor of class certification.

### (vi)     The Three *Krogman* Factors Demonstrate Efficiency

*Krogman One—Market capitalization*: During the Class Period, there were approximately 3 million shares of IPCI stock outstanding, and the market capitalization for IPCI's stock was approximately $73.3 million. *See* Coffman Report (Ex. D) at ¶66. Further, IPCI's common stock market capitalization ranged from the 7th to 17th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period. *See id*. While this market capitalization is smaller than most companies that trade on the major exchanges, the strength of the other factors allays any concerns about market inefficiency. *Id*.

*Krogman Two—Bid/ask spread*: A narrow bid-ask is powerful evidence of market efficiency. *See, e.g., Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (finding a 2.44% bid-ask spread indicated market efficiency); *see also* Coffman Report (Ex. D) at ¶¶67-68. During the Class Period, the time-weighted average percentage bid-ask spread for IPCI stock in each month was between 0.70% and 1.27%. *See id*. at ¶68. This spread is well below the average bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in June 2017 (the full month during the Class Period when IPCI had the largest percentage bid-ask spread). *See id*. Moreover, IPCI stock had a monthly average bid-ask spread of 1.27% in June 2017, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 2.09%. *Id*.

*Krogman Three—Percentage of stock not held by insiders (the "float")*: Courts have held that a large float percentage can indicate market efficiency. *See, e.g., Unger v. Amedisys, Inc.*, 401 F.3d 316, 323 (5th Cir. 2005). During the Class Period, insiders held, on average, 19.8% of all

outstanding shares of IPCI common stock, meaning that just over 80% of shares were held by non-insiders. *See* Coffman Report (Ex. D) at ¶69. This large percentage of shares held by non-insiders supports a finding of market efficiency. *See id*.

Thus, a review of the *Cammer* and *Krogman* factor strongly supports a finding that IPCI common stock traded in a highly efficient market. Therefore, reliance is presumed.[5]

### 3.    Defendants Cannot Meet Their Burden to Demonstrate Lack of Price Impact

Because IPCI common stock traded in a highly efficient market, Defendants cannot rebut the *Basic* presumption of reliance unless they overcome the heavy burden of proving "that the misrepresentation did not in fact affect the stock price." *Halliburton II*, 134 S. Ct. at 2414. As the Second Circuit made clear, a party opposing class certification bears the burden of persuasion on this issue and must demonstrate a complete lack of price impact. *See Waggoner*, 875 F.3d at 99-103; *accord Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485 (2d Cir. 2018). Indeed, Defendants must "do more than merely produce evidence that ***might*** result in a favorable outcome; they must demonstrate that the misrepresentations ***did not*** affect the stock's price by a preponderance of the evidence." *Waggoner*, 875 F.3d at 101 (emphasis in original). "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Id.* at 105.

---

[5] Coffman also considered two additional factors that support a finding of market efficiency: autocorrelation and option trading. *See* Coffman Report (Ex. D) at ¶¶71-75. If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." *Id.* at ¶71. Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency. *Id.* Here, when excluding no days from the autocorrelation analysis, the coefficient for the Class Period is statistically significant at the 90% confidence interval. *Id.* at ¶74. However, after removing three outlier dates with abnormal returns with an absolute value greater than 15%, the coefficient for the Class Period is not statistically different from zero, meaning there is no evidence of autocorrelation. *Id.* With respect to option trading, academic articles and empirical analysis have demonstrated that options improve market efficiency. *Id.* at ¶75. During the Class Period, there was option trading in IPCI common stock. *Id.* Thus, these two additional factors further demonstrate that IPCI common stock traded in an efficient market during the Class Period.

Defendants cannot prove a complete lack of price impact in this case. In fact, Plaintiffs have provided strong direct evidence in the form of an event study that clearly demonstrates the impact of Class Period events on IPCI's share price. *See* Coffman Report (Ex. D) at ¶¶45-64.

### 4.      Damages Are Capable of Classwide Determination

After resolving the common liability issues, all that will remain is the mechanical task of computing individual Class members' damages based on a common methodology. While the amount of individual damages will invariably be different, each Class member's damages under Section 10(b) can be computed in the same way, common to all Class members, using readily available daily pricing information in accordance with widely-used and generally-accepted methodologies and the PSLRA. *See* Coffman Report (Ex. D) at ¶¶76-77. Tabulation of damages will not undermine the predominance of common issues. *See*, *e.g.*, *Sykes v. Mel S. Harris and Assocs. LLC*, *et al.*, 780 F.3d 70, 88 (2d Cir. 2015) ("*Comcast* did not rewrite the standards governing individualized damage considerations . . . [a]ll that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'") (citations omitted); *see also Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402, 405 (2d Cir. 2015) (holding that individualized damages determination alone cannot defeat predominance).

### 5.      A Class Action Is the Superior Method for Adjudicating the Controversy

Securities fraud actions "easily satisfy the superiority requirement of Rule 23." *N.J. Carpenters Health Fund*, 2016 U.S. Dist. LEXIS 153804, at *34-35. Rule 23(b)(3) sets forth the following factors to be considered when assessing "superiority":

> (A) the class members' interest in individually controlling the prosecution . . . of separate actions;

16

(B) the extent and nature of any litigation concerning the controversy already begun by . . . class members;

(C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).

Here, class certification will promote judicial efficiency by permitting common claims and issues to be resolved once with a binding effect on all parties. By contrast, if Plaintiffs and each of the Class members were forced to bring separate individual actions, each would be required to prove the same wrongdoing by Defendants to establish liability, resulting in unnecessary judicial inefficiencies and potentially inconsistent judgments. More importantly, class certification is the only way to afford relief to those whose claims are too small to justify individual lawsuits. *See, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (class actions allow plaintiffs to pool claims that would otherwise be uneconomical to litigate individually). As a result, a class action is not only the superior method of adjudication, but also perhaps the only feasible way to litigate the claims alleged in this action. Plaintiffs also do not anticipate any difficulties in the management of this action as a class action.

**D.      KSF Satisfies FED. R. CIV. P. 23(g)**

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class. *See* FED. R. CIV. P. 23(g)(1)(A). These considerations all weigh in favor of appointing KSF as Class Counsel.

KSF has the experience, knowledge, and resources to represent the Class. *See* Miller Decl. at Ex. B. KSF has devoted substantial time and resources to investigating the legal and factual bases for the claims in this action, drafting the Amended Complaint, defeating Defendants' motions to dismiss, and pursuing discovery. KSF has dedicated a team of experienced attorneys prosecuting this action and will commit the necessary resources to achieve a successful recovery for investors.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing David Ducharme, Sam Snyder, Julia Ann Synder, and Vianey Manriquez as Class Representatives; (3) appointing KSF as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: May 6, 2019                              Respectfully submitted,

                                                **KAHN SWICK & FOTI, LLC**

                                                 /s/ *Kim E. Miller*
                                                Kim E. Miller (KM-6996)
                                                J. Ryan Lopatka (*admitted PHV*)
                                                250 Park Avenue, Suite 2040
                                                New York, NY 10177
                                                Telephone: (212) 696-3730
                                                Facsimile: (504) 455-1498
                                                Email: kim.miller@ksfcounsel.com
                                                Email: j.lopatka@ksfcounsel.com

                                                -and-

Lewis S. Kahn
Craig J. Geraci, Jr. (*admitted PHV*)
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com
Email: craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiffs*
*and the Class and Proposed Class Counsel*

## CERTIFICATE OF SERVICE

On May 6, 2019, the foregoing document was filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and via electronic mail.

/s/ *Kim E. Miller*
Kim E. Miller

19