**KAHN SWICK & FOTI, LLC**
Kim E. Miller (NY-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498
kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
Craig J. Geraci, Jr.
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498
lewis.kahn@ksfcounsel.com
craig.geraci@ksfcounsel.com

*Lead Counsel for Lead Plaintiffs and the
Class*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| SHAWN SHANAWAZ, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:17-cv-05761 |
| Plaintiff, | HON. J. PAUL OETKEN |
| vs. | |
| INTELLIPHARMACEUTICS INTERNATIONAL INC., ISA ODIDI and DOMENIC DELLA PENNA, | |
| Defendants. | |

**DECLARATION OF KIM E. MILLER IN SUPPORT OF FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT
PROCEEDS AND LEAD PLAINTIFFS' APPLICATION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES
AND AWARD TO LEAD PLAINTIFFS AND PROPOSED CLASS REPRESENTATIVE**

I, KIM E. MILLER, hereby declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of New York, and am admitted to practice in this Court. I am a partner at Kahn Swick & Foti, LLC ("KSF"), Lead Counsel of the Court-appointed Lead Plaintiffs David Ducharme, Sam Snyder, and Julia Ann Snyder ("Lead Plaintiffs") and the Class (as defined below) in the above-captioned Action (the "Action"). I have been actively involved in the prosecution of this Action against Defendants Intellipharmaceutics International, Inc. ("IPCI" or "the Company"), Dr. Isa Odidi ("Odidi"), and Domenic Della Penna ("Della Penna")[1] (collectively, "Defendants") since September 2017, as well as the negotiations resulting in the resolution of this Action, and I have personal knowledge of the matters set forth herein. I have also been kept informed of developments in the Action by attorneys working with me or under my direction. The statements in this Declaration are made based upon my personal knowledge unless otherwise indicated.

2.      I submit this Declaration in support of Lead Plaintiffs' Motion, pursuant to Rule 23, of the Federal Rules of Civil Procedure, for approval of: (1) the Stipulation and Agreement of Settlement filed November 11, 2019 (the "Stipulation"), which provides for a Settlement of $1,600,000 in cash (the "Settlement Amount"); (2) the proposed plan for allocating the Settlement proceeds to eligible members of the Class (the "Plan of Allocation"); and (3) Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application"). The Settlement Amount was deposited into an escrow account on August 31, 2020 and has been earning interest for the benefit of the Class since that date. The Settlement resolves all claims asserted by Lead Plaintiffs in the Consolidated Amended Class Action

---

[1] Defendants Odidi and Della Penna are hereinafter collectively referred to as the "Individual Defendants."

Complaint (the "Complaint") against all Defendants.

3.      This Declaration sets forth the nature of the claims asserted in the Action, which involved alleged misrepresentations and omissions made by IPCI and the Individual Defendants concerning the New Drug Application ("NDA") for its new product candidate, Rexista. It also details the principal proceedings to date, Lead Plaintiffs' factual investigation and targeted discovery to confirm the reasonableness of the Settlement, the extensive efforts undertaken by Lead Plaintiffs and Lead Counsel in prosecuting and resolving the Action, the substantial risks of continued litigation and the negotiations resulting in the Settlement. Lastly, it provides background facts supporting Lead Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses and modest, proposed awards to Lead Plaintiffs David Ducharme and Sam Snyder, as well as proposed Class Representative Vianey Manriquez.

## I.      PRELIMINARY STATEMENT

4.      This Action has been hard-fought from its commencement in September 2017 through the time the Parties reached an agreement in principal to settle, in August 2019. After Lead Counsel and counsel for Defendants executed a Memorandum of Understanding setting forth the material terms of the Settlement on August 9, 2019, Lead Plaintiffs filed an unopposed motion for preliminary approval of the Settlement on November 11, 2019. The Court granted Lead Plaintiffs' motion on July 30, 2020. As set forth in detail below, Lead Plaintiffs and Lead Counsel were met with vigorous opposition by Defendants. The Settlement was achieved only after Lead Plaintiffs, through the efforts of Lead Counsel: (a) researched the facts and claims that formed the basis of the initial complaint; (b) researched, briefed, and successfully argued their Motion to Consolidate Cases; to be Appointed Lead Plaintiffs and to Approve Lead Plaintiffs' Choice of Counsel; (c) conducted an extensive investigation into the underlying facts, including hiring investigators to locate and interview confidential witnesses; (d) thoroughly researched the law pertinent to the

Class members' claims and the Defendants' defenses; (e) prepared and filed the 70-page Amended Class Action Complaint for Violations of the Federal Securities Laws; (f) successfully opposed Defendants' motion to dismiss; (g) negotiated and executed a discovery protocol regarding the production of Electronically Stored Information ("ESI") and paper document and a search methodology for ESI; (h) carefully reviewed approximately 3,800 pages of documents produced by Defendants in discovery; (i) worked with expert economists and causation and damages consultants to analyze Plaintiffs' claims; (j) extensively researched, prepared, and filed Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel, which entailed retaining expert economist Chad Coffman, CFA to author a report on market efficiency; (k) submitted mediation briefs and answered questions from mediator Michelle Yoshida of Phillips ADR in advance of the mediation; (l) engaged in a formal mediation facilitated by Ms. Yoshida where the Parties presented their positions to the other side; (m) reached an agreement in principal to settle the litigation as to all Defendants and all claims; (n) worked with Defendants to prepare a Memorandum of Understanding and Stipulation of Settlement; (o) sought and evaluated competitive bids from multiple claims administrators for administration of this Settlement; (p) prepared and filed the motion for preliminary approval and stipulation of settlement, which was approved by this Court on July 30, 2020; (q) prepared and oversaw the publication of the Summary Notice of Pendency of Class Action in the *Investor's Business Daily* and over the *PR Newswire* on August 17, 2020; and (r) oversaw the settlement administration process, including, *inter alia*, the mailing of the Notice and Claim Form, supplying the Notice and Claim Form to the Class, notifying brokerage firms or other nominee accounts of the appropriate manner to provide individual notice to Class members, tracking requests for exclusion, and assisting shareholders with questions regarding the criteria for recovery and the procedure for

filing claims.

5.     This Settlement is therefore the product of vigorously contested litigation and takes into consideration the significant risks specific to the case. It was negotiated by experienced counsel with a firm understanding of both the strengths and weaknesses of their respective cases. Lead Plaintiffs also believe the $1,600,000 settlement represents a just result. Lead Counsel's substantial investigation, research, and motion practice informed Lead Plaintiffs and Lead Counsel that, while the case against Defendants had merit, it also had significant weaknesses. Along with a number of external factors, these factors had to be, and were, conscientiously evaluated in determining what course of action was in the best interests of the Class.

6.     The negotiations leading to the Settlement were also hard-fought and required the Parties' careful analysis of complex factual and legal issues. The Parties' negotiations were facilitated by a qualified mediator, Michelle Yoshida of Phillips ADR, and included the preparation and submission of detailed mediation briefs, a formal all-day in-person mediation session on August 1, 2019, during which the parties gave thorough presentations on the merits. After several rounds of negotiation, the parties reached an agreement-in-principle to settle the Action. On August 9, 2019, Lead Counsel for Plaintiffs and counsel for Defendants executed a Memorandum of Understanding setting forth the material terms of the settlement.

7.     Throughout the Action, Lead Counsel communicated on a regular basis with Lead Plaintiffs, as well as proposed Class Representative Vianey Manriquez (collectively with Lead Plaintiffs, "Plaintiffs"), regarding the status and direction of the case. Additionally, Lead Counsel updated Plaintiffs on material case developments, and Plaintiffs reviewed significant pleadings and briefs filed in the Action. Plaintiffs were also apprised of and involved in the settlement negotiations with Defendants, conferring with Lead Counsel by telephone while the mediation

transpired. After lengthy discussion regarding the particular circumstances of this Action, including the strengths and weaknesses of the Class's allegations and Defendants' defenses thereto, Plaintiffs approved the Settlement. *See* Declarations of David Ducharme, Sam Snyder, and Vianey Manriquez (attached hereto as Exhibits A, B, and C, respectively). Plaintiffs' active involvement in the prosecution and resolution of this Action, as well as their approval and support of the Settlement, are factors that strongly support this Court's approval of the Settlement.

8.      As set forth below, while Plaintiffs and Lead Counsel were confident in their ultimate success in this matter, there remained many uncertainties in Plaintiffs' case. The Complaint alleges violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Lead Plaintiffs alleged that, throughout the period from May 21, 2015 through July 26, 2017 (the "Class Period"), Defendants repeatedly made misleading statements and omitted essential information regarding the development of and FDA approval for their opioid abuse deterrence drug, Rexista. Specifically, the Complaint alleges that ICPI made misleading statements regarding: (1) Rexista's oral and nasal abuse-deterrent properties; (2) Rexista's bioequivalence to OxyContin; and (3) the contents of the Rexista NDA and discussions with the FDA regarding acceptance of the NDA. This conduct artificially inflated the price of IPCI securities and caused Lead Plaintiffs and the other members of the Class significant losses when the truth was revealed and the price of IPCI's common stock fell sharply.

9.      Plaintiffs carefully considered the significant risks attendant to proving these claims. Throughout the Action, Defendants asserted significant defenses to Lead Plaintiffs' claims. Defendants strenuously argued in their Motion to Dismiss the Amended Complaint that the case should be dismissed because Plaintiffs did not plausibly allege any actionable misstatement or omission, Plaintiffs did not allege particularized facts giving rise to the strong inference of scienter

required for securities fraud claims under the PSLRA, and Plaintiffs failed to allege a primary violation also required dismissal of the "control person" claims under section 20(a) of the Exchange Act. The Court partially granted the Motion, dismissing Plaintiffs' allegations based on Rexista's abuse-deterrent properties and bioequivalence to OxyContin.

10.     While the other allegations regarding the content and scope of studies included in the Rexista NDA survived the Motion to Dismiss, this is no guarantee they would also survive the intense scrutiny of class certification, summary judgment, and trial. Defendants offered credible legal arguments to bolster their defenses. Even though Plaintiffs disagree with Defendants' assertions and believe in the strength of their own case, the claims in this Action involve numerous complex legal and factual issues, and there is substantial risk of recovering limited or no damages if the Court or a jury agrees with any of Defendants' arguments in the future.

11.     If this Action were to continue, fact discovery would begin again, requiring Plaintiffs and Defendants to meet-and-confer regarding the scope of documentary productions, Plaintiffs to retain an ESI vendor, and Plaintiffs to analyze significant document productions. Plaintiffs and Defendants would also need conduct numerous costly and time-consuming fact and expert witness depositions. Several key witnesses live outside of the United States, which would create additional difficulty, especially due to the current global pandemic. Furthermore, the economic and damages issues in this securities Action would require expert discovery and testimony, which would add considerably to the expense and duration of the litigation. At trial, Plaintiffs would likely face a "battle of the experts," and it is always possible a jury would find Defendants' expert(s) more persuasive. These risks were considered by Plaintiffs and Lead Counsel in deciding to settle this Action on the agreed terms. Moreover, were the litigation to move forward, Defendants would likely exhaust their coverage under pertinent insurance

agreements and may be unable to maintain their defense or fund a judgment. On balance, considering all the circumstances and risks both sides face as the Parties continue their march towards trial, both Plaintiffs and Defendants concluded that settlement on the terms agreed upon was in the best interest of both sides.

12.     Plaintiffs also seek approval of the proposed Plan of Allocation as fair and reasonable. In developing the Plan of Allocation, Lead Counsel consulted with professionals at Global Economics Group in the areas of economics and damages in an effort to appropriately allocate the proceeds among eligible members of the Class.

13.     Additionally, Lead Counsel has prosecuted this Action for over three years on a wholly contingent basis and has advanced or incurred substantial litigation expenses in connection with its efforts. In doing so, Lead Counsel shouldered the risk of an unfavorable result. Over 12,528 copies of the Notice of Pendency and Proposed Settlement of Class Action, Motion for Attorneys' Fees and Litigation Expenses, and Settlement Fairness Hearing (the "Notice") were mailed to potential members of the Class and nominees, stating that Lead Counsel would apply to the Court for attorneys' fees not to exceed 33 1/3% of the Settlement Amount, plus interest earned at the same rate as the Settlement Fund. *See infra* at ¶ 44. Lead Counsel's current request for attorneys' fees in the amount of 30% of the Settlement Fund is less than the 33 1/3% fee negotiated between Lead Plaintiffs and Lead Counsel at the outset of the Action and less than the noticed amount sent to the Class. The 30% fee request is entirely justified given the particular facts of this case, the benefits conferred on the Class, the risks undertaken, the quality of representation, and the nature and extent of legal services performed.

14.     The reasonableness of the requested fee is further supported by the fact that the fee equates to a negative multiplier of 0.45 on Lead Counsel's lodestar (*i.e.*, the number of hours

expended on the case multiplied by counsel's hourly rates). In other words, the attorneys' fee requested here represents less than half of what counsel would have earned had counsel been compensated using counsel's hourly billable rates, which is eminently reasonable in light of the risk of non-payment undertaken by Lead Counsel. Moreover, Lead Counsel's fee request is supported by Plaintiffs.

15.     Lead Counsel also requests reimbursement of the expenses incurred in connection with its prosecution and resolution of the Action in the amount of $110,000, which is an amount less than the $116,851.09 in expenses Lead Counsel actually incurred, which total includes modest awards to Lead Plaintiffs David Ducharme and Sam Snyder and proposed Class Representative Vianey Manriquez (excluding those modest awards, Lead Counsel incurred only $109,851.09 in expenses). The expenses Lead Counsel incurred over the duration of this litigation – which covered, among other things, the work of qualified experts, consultants, and investigators, legal research costs, and expenses associated with mediation and travel to this District for court proceedings – were critical to Lead Counsel's and Plaintiffs' success in achieving the proposed Settlement.

16.     On behalf of Lead Counsel, I respectfully submit that the Settlement and the Plan of Allocation, for the reasons discussed herein and in the accompanying memoranda, are each "fair, reasonable, and adequate" in all respects, and that the Court should therefore approve them pursuant to Rule 23 of the Federal Rules of Civil Procedure. Likewise, I respectfully submit that Lead Counsel's request for attorneys' fees and reimbursement of litigation expenses, including Lead Plaintiffs' request for costs and expenses incurred in connection with his representation of the Class (collectively, the "Fee and Expense Application") is fair and reasonable and should be approved.

## II.     FACTUAL SUMMARY OF LEAD PLAINTIFFS' ALLEGATIONS

17.     IPCI is a pharmaceutical company purportedly engaged in the research, development, and commercialization of controlled-release and targeted pharmaceutical products, both novel and generic, with a particular emphasis in the opioid abuse deterrence space. *See* ¶ 26.[2] During the Class Period, IPCI's primary product candidate was Rexista, a purported abuse-deterrent opioid tablet. *See* ¶ 27. This Action arises from Defendants' material misrepresentations regarding the contents and scope of IPCI's NDA for Rexista. Plaintiffs and all other members of the proposed Class were injured by this common course of conduct because they purchased or otherwise acquired IPCI common stock at inflated prices during the Class Period.

18.     As a result of the opioid crisis, in April 2015, the U.S. Food and Drug Administration ("FDA") issued final guidance, entitled "Abuse-Deterrent Opioids – Evaluation and Labeling," to assist the pharmaceutical industry in developing new formulations of opioid drugs with abuse-deterrent properties (the "FDA Guidance"). ¶ 32. In order to obtain FDA approval, the FDA Guidance recommends three particular categories of studies to manufacturers seeking to "obtain a full and scientifically rigorous understanding of the impact of a technology or technologies on a product's abuse potential." ¶ 34. The three categories of recommended studies are: (i) laboratory based in vitro manipulation and extraction studies ("Category 1 studies"), designed to evaluate the ease with which a drug can be manipulated to evade its abuse-deterrent properties; (ii) pharmacokinetic studies ("Category 2 studies"), designed to evaluate the varying ways the drug would be processed by the user's body when taken intact or in manipulated form and in comparison with other drugs; and (iii) clinical abuse potential studies ("Category 3 studies"), designed to assess the impact of the drug's abuse-deterrent properties on actual using

---

[2] Unless otherwise stated, "¶ __" citations refer to allegations in the Amended Complaint (Dkt. No. 25).

populations. ¶¶ 35–36. While the FDA Guidance only constitutes a general "recommendation" to sponsors, the FDA advised IPCI to follow the FDA Guidance in meetings with the Company before IPCI filed the Rexista NDA. ¶ 58.

19.     On November 25, 2016, the start of the Class Period, IPCI announced that it filed an NDA for Rexista and assured investors that "[t]he [NDA] submission [included] a comprehensive array of abuse-deterrent studies conducted to support abuse-deterrent label claims related to abuse of drug by oral, intra-nasal and intravenous pathways, having reference to the [FDA Guidance]." ¶ 44. Throughout the Class Period, Defendants continued to make similar statements regarding the contents and scope of the Rexista NDA. *See* ¶¶ 97, 100, 103, 107, 110. These statements naturally led investors to believe that: (1) the "comprehensive array of abuse-deterrent studies" to support abuse-deterrent claims for three routes of abuse included more than just Category 1 studies; (2) the Rexista NDA was submitted in line with the FDA Guidance; and (3) IPCI was seeking abuse-deterrent labeling claims for all three routes of abuse (not just intravenous). These statements, however, were contradicted by the contents of the Rexista NDA, and the true facts were ultimately revealed to investors on July 24 and 27, 2017, dissipating the artificial inflation in IPCI's stock price. *See, e.g.*, ¶¶ 96, 112-15.

20.     Specifically, on July 24, 2017, the FDA published background materials in advance of the June 26 FDA Advisory Committee meeting to review the Rexista NDA. *See* ¶ 50. These materials publicly revealed for the first time that, despite representations to the contrary, IPCI submitted only Category 1 studies to support labeling for abuse-deterrent properties only for the IV route of abuse (and not also for nasal and oral routes of abuse). *See id.* As a result of these partial revelations of the true facts, the price of IPCI's common stock fell 14%. *See* ¶ 113.

21.     Two days later, on July 26, 2017, the FDA Advisory Committee convened to

review the Rexista NDA voted overwhelmingly to deny its approval, largely due to the NDA's noncompliance with the FDA's Guidance. *See* ¶¶ 56–57. The next day, before the market opened, IPCI issued a press release advising investors of the devastating outcome of the FDA Advisory Committee meeting. *See* ¶ 114. As a result of these revelations, the price of shares of IPCI's common stock again fell sharply, this time by more than 45%. *See id.*

## III.   PROCEDURAL HISTORY

### A.   The Filing of the Action and Appointment of Lead Plaintiffs

22.     The original complaint for violations of federal securities laws against Defendants was filed on July 28, 2017. Two additional lawsuits were filed shortly thereafter. On November 21, 2017, the Court consolidated the three actions against Defendants, and appointed David Ducharme, Sam Snyder, and Julia Ann Snyder as Lead Plaintiffs. *See* Opinion & Order Appointing Lead Plaintiffs, Dkt. No. 23. Plaintiffs filed their Amended Complaint on January 29, 2018. *See* Amended Complaint, Dkt. No. 25. Generally, the Complaint alleged three types of misrepresentations: (1) Defendants' statements describing the content and scope of studies included in the Rexista NDA; (2) Defendants' statements describing Rexista's "bioequivalence" to OxyContin; and (3) Defendants' descriptions of Rexista's oral and nasal abuse-deterrent properties. *Id.* Defendants filed an answer to the Complaint on January 7, 2019. *See* Defs.' Answer, Dkt. No. 38.

### B.   The Complaint Survives Defendants' Motion to Dismiss

23.     On March 30, 2018, Defendants moved to dismiss the Complaint, claiming: (i) Plaintiffs did not allege any actionable misstatements or omissions; and (ii) Plaintiffs did not allege particularized facts giving rise to a strong inference of scienter. *See* Defs.' Mot. Dismiss, Dkt. No. 29. On December 17, 2018, the Court denied Defendants' motion to dismiss in part. *See* Opinion & Order Den. Defs.' Mot. Dismiss, Dkt. No. 35. In a well-reasoned opinion, the Court granted

Defendants' motion to dismiss with respect to Plaintiffs' Section 10(b) and 20(a) claims only to the extent they were based on Defendants' statements describing Rexista's abuse-deterrent features and its bioequivalence to OxyContin, but denied the motion with respect to Plaintiffs' Section 10(b) and 20(a) claims based on Defendants' statements describing the contents of the Rexista NDA as filed with the FDA.

24.    With respect to Defendants' public statements describing the contents of the Rexista NDA, the Court found these statements to be actionable because they "are directly contradicted by the true contents of the Rexista NDA." *See* Dkt. No. 35 at 16. The Court found that "Defendants' alleged public representations that the Rexista NDA contained studies necessary to support nasal and oral abuse-deterrent labelling were [] false when made, and accordingly, these statements may constitute actionable representations." *Id*. The Court further held that "[t]he same conclusion is warranted with respect to the portions of these statements in which Defendants represented that the NDA was submitted with 'reference to the FDA's 'Abuse-Deterrent Opioids'…would plausibly have led a reasonable investor to believe that Defendants had fully complied with the terms of Guidance to the extent necessary to obtain such a suite of abuse-deterrent labeling." *Id*. "Accordingly, Defendants' statements describing the scope of the NDA's compliance with the terms of the Guidance may also subject Defendants to Section 10(b) liability." *Id.* Regarding scienter, the Court found the Complaint provided "strong circumstantial evidence of conscious misbehavior or recklessness" and made "a strong showing that the defendants had both motive and opportunity to commit the fraud." *Id.* at 19-20.

### C.    Class Certification

25.    Lead Plaintiffs and proposed Class Representative Vianey Manriquez motioned for class certification, appointment of class representatives, and appointment of class counsel on May 6, 2019. *See* Pls.' Mot. Class Certification, Dkt. No. 47. Plaintiffs argued the requirements of Rule

23(a) are satisfied because: (i) there are thousands of geographically dispersed Class members, as IPCI was listed on the NASDAQ, where it traded, on average, 133.2 thousand shares weekly with approximately 3 million shares outstanding; (ii) common issues relating to IPCI's violation of federal securities laws, misrepresentations of material fact, scienter, and damages predominate; (iii) Plaintiffs' claims are typical of the class; and (iv) Plaintiffs will fairly and adequately represent the Class, as they suffered the same injuries as the other members of the Class, have no conflicts of interest with the absent Class members, and have selected counsel who will zealously advance the Class's interests. *Id.* Plaintiffs further argued that the predominance requirement of Rule 23(b)(3) is met in this case under the fraud-on-the-market theory because the alleged misrepresentations were public, IPCI stock traded in an efficient market, and Plaintiffs traded the stock between when the misrepresentations were made and before the truth was fully revealed. *Id.* Indeed, Plaintiffs retained expert economist Chad Coffman, CFA to prepare and submit a report on the issue of market efficiency, which was central to Plaintiffs' motion for class certification.

26.     This Action was stayed due to the pending mediation shortly after Plaintiffs filed their motion for class certification and before Defendants filed their opposition. Defendants would have vigorously opposed class certification, likely by attacking Plaintiffs' adequacy arguments and by attempting to demonstrate a lack of price impact.

### D.     Lead Plaintiffs' Investigation and Fact Discovery

27.     Following its appointment as Lead Counsel, KSF conducted an extensive investigation of Defendants and the conduct that formed the basis for the allegations in the Amended Complaint. This investigation included: the retention of and coordination with private investigators; interviews of numerous persons with knowledge of the allegations, including former employees of IPCI as well as third parties; consultation with experts on the issues of damages and market efficiency; a thorough review of the Company's annual reports, press releases, and

financial statements; thorough review of myriad news articles and analysis reports; and other factual and legal research, including substantial research on complex issues.

28.     The Parties were in the midst of fact discovery when they decided to mediate. At the parties' request, this Court ordered a stay pending the outcome of the mediation, which resulted in this proposed Settlement. Prior to the stay, Plaintiffs and Defendants each propounded one set of Requests for Production, and both sides timely provided written responses. The Parties also agreed to a protocol regarding the production of ESI and paper documents and agreed to a search methodology for ESI. Pursuant to the ESI Protocol, discovery would be conducted in two phases utilizing search terms: Phase I and Phase II. The parties agreed to the search terms to be utilized in Phase I, and Defendants produced a limited number of documents (consisting of 3,799 pages) in advance of the mediation. Plaintiffs' Counsel analyzed and reviewed these materials prior to mediation.

29.     With the benefit of this discovery, Lead Counsel and Plaintiffs have sufficient knowledge of the strengths and weaknesses of the claims asserted in this Action, having identified specific documents that corroborate those claims. This has permitted them to fully consider and evaluate the fairness of the Settlement to the Class.

## IV.    THE STRENGTHS AND WEAKNESSES OF THE CASE

30.     Based on its experience and close knowledge of the facts and applicable law, Lead Counsel – a law firm well-versed in the prosecution of complex securities litigation – believes that the Settlement is in the best interest of the Class. Lead Plaintiffs have also approved the Settlement.

31.     While Lead Plaintiffs believe that their allegations have merit, Lead Plaintiffs are also aware that, because the Court dismissed certain categories of statements pursuant to Defendants' motion to dismiss, they are likely to face strong challenges to loss causation at both the class certification and summary judgment stages. Additionally, at class certification,

Defendants would likely challenge market efficiency, as well as the adequacy and typicality of Lead Plaintiffs and proposed Class Representatives. Finally, with respect to summary judgment, Defendants would also likely challenge falsity, loss causation, damages and scienter. Each of these issues presented a risk of non-recovery that Lead Plaintiffs and Lead Counsel considered in reaching the proposed Settlement.

### A.   Certification of the Class

32.   While Plaintiffs believe that securities fraud actions such as this Action are uniquely appropriate for class action treatment, Plaintiffs are also aware that Defendants would have raised challenges to the motion for class certification. Plaintiffs believe that the Class satisfies the requirements of Fed. R. Civ. P. 23, and that they would prevail in establishing numerosity, commonality, typicality, and predominance. Further, Plaintiffs believe that they have, and would continue to, adequately and fairly protect the interests of the Class. Plaintiffs are also aware, however, that Defendants would have vigorously argued against class certification. Defendants would likely advance arguments against market efficiency and submit an expert report challenging both market efficiency and price impact. Plaintiffs also anticipate Defendants would challenge the adequacy and typicality of Lead Plaintiffs and the proposed Class Representative. If the Court found any of these arguments persuasive, it could decline to certify the Class. While Lead Counsel believes their arguments would have prevailed, class certification would have been far from certain.

33.   Even if the Class obtained certification, Defendants may have petitioned the Second Circuit for permission to appeal that decision pursuant to Rule 23(f), which could result in substantial delays in the resolution of the litigation. The recent case of *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc. ("Goldman II")*, 955 F.3d 254 (2d Cir. 2020) is instructive on this point. There, the district court originally granted plaintiffs' motion for class certification on September

24, 2015. *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10-cv-3461, 2015 U.S. Dist. LEXIS 128856, at *25 (S.D.N.Y. Sep. 24, 2015). Thereafter, defendants filed a motion for leave to appeal the district court's ruling on class certification pursuant to Fed. R. Civ. P. 23(f). *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, No. 15-3179, 2016 U.S. App. LEXIS 23694 (2d Cir. Jan. 26, 2016). The Second Circuit granted defendants' petition and, nearly two years later, entered an order vacating the district court's order and remanded the district court to reconsider defendants' evidence on price impact in light of its ruling in *Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017). *See Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc. ("Goldman I")*, 879 F.3d 474, 478 (2d Cir. 2018). On remand, the district court once again granted plaintiffs' motion for class certification. *See In re Goldman Sachs Grp., Inc.*, No. 10-cv-3461, 2018 U.S. Dist. LEXIS 137414 (S.D.N.Y. Aug. 14, 2018). Yet again, however, defendants filed a motion for leave to appeal the district court's second ruling on class certification pursuant to Rule 23(f), and yet again, the Second Circuit granted defendants' motion. On April 7, 2020, some four and a half years after the district court originally granted plaintiffs' motion for class certification, the Second Circuit entered its order denying defendants' petition and sustaining the district court's order certifying the class. *See Goldman II*, 955 F.3d at 258. On August 21, 2020, defendants filed a petition for certiorari, which petition is still pending before the Supreme Court. The danger of a protracted delay at the class certification state is very real.

### B.   Risk of Establishing Liability and Damages at Summary Judgment and Trial

34.     Assuming the Court would have granted Plaintiffs' motion for class certification, Defendants would have then presented additional arguments at summary judgment and trial in order to defeat Plaintiffs' claims. Most notably, Defendants may have raised arguments regarding falsity, scienter, damages, and/or loss causation, the outcome of which is notoriously difficult to

predict. In order for the Class to recover damages at the level estimated by Plaintiffs' expert, Plaintiffs would need to prevail on each and every one of the claims alleged, and for the entire Class. Notwithstanding this fact, the jury would also have to adopt Plaintiffs' expert's damages analysis over Defendants' expert's analysis, and such expert battles are never predictable.

35.     Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.SC. § 78u–4 (b)(2)(A). The risks inherent in proving this heightened standard for scienter for Plaintiffs' remaining claims are significant due to, *inter alia*, the nature of Defendants' alleged misrepresentations and omissions, which center on IPCI's representations about compliance with FDA guidelines when submitting their Rexista NDA. Defendants vigorously challenged their scienter for these statements over the course the motion to dismiss briefing. While the Court found "[t]he Amended Complaint provides 'strong circumstantial evidence of conscious misbehavior or recklessness,'" there is always a possibility that, post-discovery, the Court or a jury will find inadequate evidence of scienter under the heightened requirements of the PSLRA. Indeed, securities cases that have survived a motion to dismiss have later been defeated scienter and/or loss causation grounds at summary judgement. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (affirming district court's order granting summary judgment in favor of defendants on the issue of loss causation); *Gross v. GFI Grp. Inc.*, 310 F. Supp. 3d 384, 395 (S.D.N.Y. 2018) (granting defendants' motion for summary judgment on the issue of scienter).

## V.     SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

### A.     The Parties' Settlement Negotiations and Resulting Settlement

36.     The Parties began discussing a possible resolution of the Action after Plaintiffs motioned for class certification. The Settlement process included a formal day-long, in-person mediation session facilitated by a qualified mediator, Ms. Yoshida.

37.     The formal mediation with Ms. Yoshida was held on August 1, 2019 in New York, New York. In advance of the mediation, the Parties prepared and submitted detailed pre-mediation briefs for the mediator's review, which set forth their respective views of the relevant law and facts. During the mediation, impasses arose on several key issues, most notably damages and extraterritoriality (*i.e.*, whether securities traded on Canadian exchanges would be covered in the proposed Settlement). With the support and proposal of Ms. Yoshida, however, the Parties were able to come to an agreement on a proposed Settlement late in the evening.

38.     Thereafter, the Parties began the process of formalizing the documentation to embody their Settlement agreement. On August 9, 2019, Lead Counsel for Plaintiffs and counsel for Defendants executed a Memorandum of Understanding setting forth the material terms of the Settlement. Then, on November 11, 2019, the parties filed a Stipulation of Settlement with the Court and applied for a Preliminary Approval Order for the terms set forth therein. *See* Stip. Settlement, Dkt. No. 58.

39.     On July 30, 2020, the Court issued its Order Preliminarily Approving Settlement and Providing for Notice of Pendency. *See* Preliminary Approval Order, Dkt. No. 62. In this order, the Court preliminarily certified, for settlement purposes only, a Class consisting of "all Persons or entities who purchased or otherwise acquired Intellipharmaceutics common stock in a Covered Transaction at any time from May 21, 2015 through and including July 27, 2017," excluding "Defendants, members of their immediate families, and their legal representatives, heirs, successors or assigns. *Id.* at ¶ 2. The Court also approved for publication the Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), the Proof of Claim and Release form, and the Summary Notice which were attached to the Stipulation. *See id.* at ¶ 5.

**B.      Notice to the Class Meets the Requirements of Due Process and Rule 23 of the Federal Rules of Civil Procedure**

40.      Pursuant to its Preliminary Approval Order, the Court set: (i) November 20, 2020 as the deadline for filing papers in support of the Final Settlement, the Plan of Allocation, and the application by Lead Counsel for attorneys' fees or reimbursement of expenses (collectively, the "Applications"); (ii) October 16, 2020 as the deadline for submitting any written objections to the Settlement; (iii) November 30, 2020 as the deadline for submitting requests to be excluded from the Class or filing any opposition to any of the applications; (iv) December 2, 2020 as the deadline for all replies to responses to any opposition to the Applications; and (v) a Fairness Hearing to be held on December 4, 2020 at 12:00 p.m., EST. D.E. No. 62.

41.      In accordance with the Preliminary Approval Order, Lead Counsel instructed Rust Consulting, Inc. ("Rust"), the Court-appointed Claims Administrator for the Settlement, to: (1) mail copies of the Notice and Proof of Claim Form (together, the "Notice Packet") by first-class mail, postage prepaid to potential members of the Class and nominees; and (2) publish the Summary Notice in accordance with the Preliminary Approval Order (*i.e.*, in *Investor's Business Daily* and over *PR Newswire*). The Notice Packet contains, among other things, a description of the Settlement, information regarding the lawsuit, the Plan of Allocation, and the right of Class Members to: (a) participate in the Settlement; (b) object to any aspect of the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; or (c) exclude themselves from the Class. The Notice Packet also informs recipients of Lead Counsel's intent to apply for an award of attorneys' fees not to exceed 33 1/3% of the Settlement Amount and for reimbursement of Litigation Expenses in an amount not to exceed $110,000, plus interest on both amounts.

42.      As set forth in the Declaration of Jason Rabe regarding mailing of the notice of pendency and proposed settlement of class action and proof of claim, Rust initially disseminated

nearly 4,016 copies of the Notice Packet to potential members of the Class and nominees in accordance with the Preliminary Approval Order. *See* Initial Rabe Decl., Dkt. No. 63-1 at ¶ 3. In accordance with the Preliminary Approval Order, on August 17, 2020, Rust caused the Summary Notice to be published in *Investor's Business Daily* and over *PR Newswire*. *Id.* at ¶ 6.

43.     Lead Counsel also caused Rust to establish a website dedicated to the Settlement (www.intellipharmaceuticssecuritieslitigation.com). The website provides members of the Class with information concerning the Settlement and access to downloadable copies of the Claim Form, Notice, and 90-day Lookback Averages, as well as a copy of the Stipulation and the Preliminary Approval Order and copies of other filings in this Action. Additionally, Rust established and maintains a toll-free telephone number, 1-866-645-4810, to respond to inquiries from Class members regarding the Settlement.

44.     During the process of providing Notice to Class Members, Rust received requests from brokers and nominees to either: (1) send the Notice to the broker or nominee for distribution to their customers with relevant holdings, or (2) send the Notice directly to their customers with relevant holdings. To date, through direct mailings and mailings to brokers and nominees, Rust has mailed over 12,528 claim forms to Class Members and received 147 submitted claims forms. *See* Supplemental Declaration of Jason Rabe ("Suppl. Rabe Decl."), attached as Exhibit D to the Miller Decl., at ¶¶ 3, 8.

45.     As set forth above, the deadline for members of the Class to file an opposition to the Settlement, Plan of Allocation, and/or Fee and Expense Application was October 16, 2020, and the deadline to request exclusion from the Class is November 30, 2020. While the deadline for submitting requests to be excluded from the class has not yet passed, as of November 20, 2020, Rust has received no objections and no valid exclusion requests. *Id.* at ¶¶ 6-7.

### C.      Participation in the Settlement and Submission of Claims

46.      Class Members who wish to be potentially eligible to receive a distribution from the Settlement Fund are required to submit a completed Proof of Claim to the Court-authorized claims administrator, Rust, postmarked no later than January 5, 2021.

47.      The Claims Administrator, supervised by Lead Counsel, will make all reasonable efforts to resolve any curable defects in Proof of Claim Forms to ensure that all Class members with otherwise valid Claims are not rejected and obtain their rightful compensation from the Settlement Fund.

## VI.      THE PLAN OF ALLOCATION

48.      As mentioned above, pursuant to the Court's Preliminary Approval Order and as set forth in the Notice, Class Members who wish to participate in the Settlement and be potentially eligible to receive a distribution from the Settlement Fund must submit a valid Proof of Claim to the Claims Administrator postmarked on or before January 5, 2021. *See* Dkt. No. 62 at ¶ 10.

49.      Lead Plaintiffs have proposed a plan for allocating the proceeds of the Settlement among members of the Class who submit timely and valid Proofs of Claim in connection with the Settlement. The objective of the proposed Plan of Allocation is to equitably distribute the net proceeds of the Settlement to Authorized Claimants[3] based on their respective alleged economic losses as a result of the alleged violations of federal securities laws asserted in the Action, as opposed to losses caused by market-wide or industry-wide factors, or company-specific factors unrelated to the alleged fraud. Calculations under the Plan of Allocation are generally based upon the measure of damages set forth in Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

---

[3] An "Authorized Claimant" is a Class Member who submits a timely and valid Proof of Claim to the Claims Administrator (in accordance with the requirements established by the Court) that is approved for payment from the Net Settlement Fund.

50.     The Plan of Allocation was prepared in consultation with professionals at Global Economics Group. Although the Plan of Allocation is not a formal damages analysis, it reflects Lead Plaintiffs' damages consultants' analysis, including a review of publicly available information regarding IPCI and statistical analysis of the price movements of IPCI securities during the Class Period. Lead Counsel believes that the Plan of Allocation is fair, reasonable, and adequate to the Class.

51.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each share of IPCI common stock purchased or otherwise acquired during the Class Period from May 21, 2015 (inclusive) through July 27, 2017 (prior the opening of the market). The calculation of the Claimant's Recognized Loss Amounts will depend upon several facts, including when the shares of IPCI common stock were purchased or otherwise acquired during the Class Period, and in what amounts, and whether those share were sold, and if sold, when they were sold, and for what amounts.

52.     The Plan of Allocation sets forth the estimated alleged artificial inflation in the price of IPCI common stock during the Class Period. The computation of the estimated alleged artificial inflation in the price of IPCI common stock during the Class Period is based on certain misrepresentations alleged by Lead Plaintiffs in the Complaint and the price change of IPCI common stock based thereon, net of market-wide and industry-wide factors, in reaction to the public announcements that allegedly corrected Defendants' material misrepresentations and omissions. In order to have a Recognized Loss Amount, the shares of IPCI common stock purchased or otherwise acquired during the Class Period must have been held through July 24, 2017 - the date of the first alleged corrective disclosure.

53.     Under the Plan of Allocation, Recognized Loss and Gain Amounts also take into

account the PSLRA's statutory limitation on recoverable damages, whereby losses on eligible shares of IPCI common stock cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the 90-day period subsequent to the Class Period if the share was held through October 24, 2017 (*i.e.*, the end of the 90-day period) and losses on eligible shares of IPCI common stock purchased or otherwise acquired *during* the Class Period and sold during the 90-day period subsequent to the Class Period cannot exceed the difference between the purchase price paid for the stock and the average price of the stock during the portion of the 90-day period elapsed as of the date of sale. A table showing the average 90-day look-back price for each day of the 90-day period is attached as Table 2 to the Notice. *See* Published Notice, Dkt. No. 63-2 at 9.

54. As further explained in the Plan of Allocation, a Claimant's "Recognized Claim" will be determined by totaling the Claimant's Recognized Loss Amounts and subtracting from that total the sum of the Claimant's Recognized Gain Amounts. If this calculation results in a positive number, that figure will be the Claimant's Recognized Claim. If this calculation results in a negative number, or zero, the Claimant's Recognized Claim will be zero. The Net Settlement Fund will be allocated on a *pro rata* basis to Authorized Claimants based on each Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants. Under the Plan of Allocation, if a Claimant's *pro rata* payment calculates to less than $10.00, no distribution will be made to that Claimant.

55. Pursuant to the Plan of Allocation, any remaining funds in the Next Settlement Fund, after six months from the date of distribution of such Net Settlement Fund, shall be reallocated among and distributed to Authorized Claimants in an equitable and economic fashion. Thereafter, any remaining balance shall be donated to an appropriate 501(c)(3) non-profit

organization(s) to be selected by Lead Counsel. *See* Dkt. No. 58 at ¶ 5.7; *Trinidad v. Pret A Manger (USA) Ltd.*, No. 12-cv-6094, 2014 U.S. Dist. LEXIS 132186, at *7 (S.D.N.Y. Sep. 19, 2014) ("Any unclaimed funds will go to City Harvest, a charitable organization that has a longstanding relationship with Pret.").

56.     The structure of the Plan of Allocation is comparable to plans of allocation that have been used in numerous securities class actions. Lead Counsel submits that the Plan of Allocation is fair and reasonable and should be approved together with the Settlement. In addition, in response to the dissemination of over 12,528 copies of the Notice Packet to potential Class Members and nominees, there have been no objections to date to the proposed Plan of Allocation.

## VII.   THE SETTLEMENT IS IN THE BEST INTERESTS OF THE CLASS AND WARRANTS FINAL APPROVAL

57.     Plaintiffs believe that they would have prevailed on the merits at trial. Defendants are just as adamant that Plaintiffs would not have succeeded. There was a significant risk that Plaintiffs would not have convinced a jury that IPCI, Odidi, and Penna made false and misleading statements with the requisite state of mind and that these statements caused Plaintiffs' losses. Moreover, the Court could have denied Plaintiffs' Motion for Class Certification or entered summary judgment for Defendants, the jury could have found in Defendants' favor, or Plaintiffs could have lost on appeal.

58.     Having considered the foregoing risks and evaluated Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and its extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable and adequate, and in the best interests of the Class.

## VIII.   LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

59.     As set forth above, the Notice provides that Lead Counsel will apply to the Court

for attorneys' fees not to exceed 33 1/3% of the Settlement Amount and reimbursement of expenses not to exceed $110,000, plus interest earned on these amounts at the same rate as the Settlement Fund. As set forth in the accompanying memorandum of points and authorities in support of its Fee and Expense Application (the "Fee Memorandum"), Lead Counsel is requesting attorneys' fees in the amount of 30% of the Settlement Fund and reimbursement of expenses in the amount of $100,000, which is less than those expenses Lead Counsel actually incurred. As discussed in the accompanying Fee Memorandum, the requested fee is well within the range of what is customarily awarded in similar complex actions. Lead Counsel, with the assistance of its economics consultant, calculated the maximum damages attributable to Defendants' alleged wrongdoing at $12.5 million. Thus, the recovery of $1,600,000, representing approximately 12.8% of total maximum damages, is an excellent result for the Class. Lead Counsel nevertheless only seeks attorneys' fees of 30%, less than that maximum amount set forth in the Notice. Lead Counsel's fractional lodestar multiplier of .45 further demonstrates an exceptional value to the Class.

60.     The expenses incurred by Lead Counsel in connection with this litigation are set forth below. Lead Counsel, in seeking reimbursement of $110,000 in reasonable expenses, has averred that the expenses incurred in this Action are reflected on the books and records maintained by the firm and are an accurate recording of the expenses incurred. In total, Lead Counsel has incurred reimbursable expenses in the amount of $116,851.09, exceeding the noticed cap by approximately $6,851.09, if the modest proposed awards for Lead Plaintiffs and the proposed Class Representative are included. Those expenses include reasonable fees paid to the mediator and Lead Plaintiffs' experts, consultants, and investigators who provided Lead Plaintiffs with extensive assistance during this litigation, and $7,000 in awards to Lead Plaintiffs David Ducharme

and Sam Snyder and proposed Class Representative Vianey Manriquez. Yet, while Lead Counsel respectfully submits that all of the expenses incurred by Lead Counsel are reasonable and were necessarily incurred in connection with the prosecution and resolution of this Action, it seeks reimbursement of expenses in the amount of $110,000.[4]

### A.    Lead Counsel's Application for Attorneys' Fees

61.    For its efforts on behalf of the Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. The percentage method is the appropriate method of fee recovery because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.[5]

62.    Lead Counsel requests a fee of 30% of the Settlement Fund.[6] As set forth in the accompanying Fee Memorandum, numerous district courts within the Second Circuit have applied the percentage-of-recovery method in awarding fees. The percentage sought is merited in this case in light of the effort required and the result obtained and is indeed lower than percentages awarded by many courts in this Circuit in common fund cases.

---

[4] If the reimbursable expenses for Lead Counsel were to exclude the expense of $7,000 for the modest proposed awards for plaintiffs and representatives, those expenses would have totaled $109,851.09, within the noticed $110,000 expense cap.

[5] District courts in the Second Circuit also consider the factors enumerated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 42, 50 (2d Cir. 2000) when assessing a request for attorneys' fees from a common fund. The six Goldberger factors are: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.*

[6] Additional Plaintiffs Guy Braverman and Eric Ludwig are represented by Pomerantz LLP ("Pomerantz"). Pursuant to a fee sharing arrangement with Lead Counsel and subject to the Court's approval, Pomerantz will receive up to 30% of any attorneys' fees awarded by the Court. The fractional multiplier of 0.45 includes time spent by Lead Counsel in this litigation only.

1.      The Requested Fee is Reasonable

63.      Lead Counsel undertook time-consuming, challenging, and risky work to prosecute the claims against Defendants and to achieve this Settlement. As detailed above, this Action was settled only after Lead Counsel (and its agents) had conducted an extensive and ongoing investigation into the Class's claims, thoroughly researched the facts and law applicable to the Class's claims and Defendants' defenses thereto, prepared and filed a fact-specific Amended Complaint detailing each Defendant's alleged violations of the federal securities laws, opposed Defendants' motions to dismiss, reviewed approximately 3,800 pages of documents produced in discovery, prepared and filed a motion for class certification, considered the risks of continued litigation, and engaged in vigorous settlement negotiations with defense counsel, including formal mediation, which resulted in a favorable financial recovery for the Class.

64.      Since the inception of the Action, Lead Counsel has dedicated over 1,599 hours to the investigation, prosecution, and resolution of the claims against Defendants, resulting in a lodestar of $1,065,712.50. Applying a lodestar cross-check, the requested fee of 30% of the Settlement Fund, or $480,000, yields a fractional multiplier of approximately 0.45. In other words, the attorneys' fee requested here represents less than half of what counsel would have earned had counsel been compensated using counsel's hourly billable rates, which is eminently reasonable in light of the risks undertaken by Lead Counsel.

65.      The lodestar enumerated below includes a schedule that indicates the amount of time spent by each attorney and professional support staff member at KSF who worked on this Action and the lodestar calculations based on their current billing rates. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by Lead Counsel and was carefully reviewed and reduced by me, where I deemed it appropriate. The hourly rates for the attorneys and professional support staff included in the schedule are commensurate with the

27

hourly rates charged by lawyers and paraprofessionals of reasonably comparable skill, experience, and reputation in performing similar services. For personnel who are no longer employed by Lead Counsel, the lodestar is based upon the billing rates for such personnel in their final year of employment. The lodestar of attorneys and professional support staff who worked less than ten (10) hours on the Action has been excluded from the lodestar calculation. Lead Counsel has billed its time devoted to travel at 50% of each attorney and professional support staff member's prevailing hourly rate. Finally, Lead Counsel has excluded from its calculations that work its attorneys and professional support staff expended on the Memorandum of Law in Support of Lead Plaintiff's Motion for An Award of Attorneys' Fees and Reimbursement of Litigation Expenses (33.1 hours).

| Staff: | Total Duration: | Rate:* | Lodestar: |
|---|---|---|---|
| Lewis Kahn (P) | 66.1 | $1,110 | $68,310.00 |
| Kim Miller (P) | 190.2 | $950 | $180,690.00 |
| J. Lopatka (P) | 118.5 | $750 | $88,875.00 |
| Craig Geraci (P) | 444.1 | $750 | $326,700.00 |
| Matthew Woodard (A) | 420.6 | $575 | $241,845.00 |
| Bruce Dona (A) | 92.6 | $550 | $50,930.00 |
| Morgan Embleton (A) | 76.7 | $525 | $40,267.50 |
| Jyoti Kehl (A) | 29.1 | $400 | $11,640.00 |
| Emily Hall (A) | 64.5 | $385 | $24,832.50 |
| Anna Potter (A) | 51.8 | $325 | $16,835.00 |
| Zoey Akin (A) | 45.5 | $325 | $14,787.50 |
| **Total** | **1,599.7** | **Total Lodestar:** | **$1,065,712.50** |

(P)      - Partner
(A)      - Associate
*        - Time devoted to travel is billed at 50% of each Staff's prevailing hourly rate

66.      I supervised and directed the time spent by KSF in this Action. Work assignments were allocated in a manner I determined was the most efficient and cost effective. Associate attorneys were utilized to accomplish experience-appropriate projects, while more senior attorneys, including me, spent time supervising projects, reviewing or revising final work product

before it was submitted to the Court (or the mediator) or served on Defendants and/or third parties and communicating on substantive matters with the senior attorneys representing Defendants in the Action.

    2.    <u>The Support of Lead Plaintiffs and Reaction of the Class</u>

67.    Lead Counsel is submitting its Fee and Expense Application with the prior approval of Lead Plaintiffs, David Ducharme, Sam Snyder, and Julia Ann Snyder, as well as proposed Class Representative Vianey Manriquez, and this application is, in all respects, in accordance with the retainer agreement entered into by Lead Plaintiffs and Lead Counsel at the outset of the Action. *See* Ducharme, Snyder, and Manriquez Decls. at Ex. A, B, and C. Under the retainer agreement, Lead Counsel agreed to litigate the Action on an entirely contingent basis, meaning that Lead Counsel would not be compensated at all, or reimbursed for any expenses it incurred on behalf of the Class, unless it obtained a recovery for the Class. The retainer agreement also provided that, if Lead Counsel was successful in obtaining a recovery for the Class, it could seek up to 33 1/3% of the recovery as attorneys' fees. *Id*. Lead Plaintiffs' support of the 30% fee request – and the fact that this fee request is less than the percentage negotiated *ex ante* with Lead Plaintiffs – adds additional support to Lead Counsel's fee request.

68.    Lead Plaintiffs actively monitored the litigation and consulted with Lead Counsel over the course of this Action, as well as throughout the settlement negotiations. *Id.* Here, in negotiating the Settlement, Lead Counsel acted under the direct supervision of Lead Plaintiffs. Lead Plaintiffs' support of the requested attorneys' fees should be given considerable weight. In the post-PSLRA era, the support of the Court-appointed Lead Plaintiffs is a significant consideration in determining a fair fee.

69.    To date, following the dissemination of over 12,528 Notice packets, each of which informed potential Class Members of Lead Counsel's intent to seek a fee of up to 33 1/3% of the

Settlement Fund and reimbursement of litigation expenses up to $110,000, there have been no objections to the amount of attorneys' fees and expenses set forth in the Notice.

### 3. Standing and Experience of Lead Counsel

70. The expertise and experience of counsel is an important factor in setting a fair fee. As Lead Counsel's firm resume, attached hereto as Exhibit E, demonstrates, the attorneys at KSF are experienced and skilled securities class action litigators and have a successful track record in securities cases throughout the country – including within this Circuit.

### 4. Standing and Caliber of Opposing Counsel

71. The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants are represented by DLA Piper LLP. DLA Piper has defended multiple securities cases resulting in landmark decisions, including the first reported defense win under the Private Securities Litigation Reform Act of 1995, *Zeid v. Kimberley (Firefox)*, 930 F.Supp. 431 (N.D. Cal. 1996), and the first reported appellate decision affirming the dismissal of an accounting fraud case under that statute, *In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002). This renowned, large defense firm spared no effort in the vigorous defense of their clients. In the face of this formidable opposition, Lead Plaintiffs and Lead Counsel developed, litigated, and successfully negotiated an excellent recovery in this Action for the Class.

### 5. The Monetary Settlement Achieved

72. The $1,600,000 Settlement was achieved as a result of extensive negotiations, as detailed herein. The Settlement is a favorable recovery to the Class – representing a substantial percentage of the recoverable aggregate damages for the claims as estimated by Lead Plaintiffs' damages consultants, prior to taking into account Defendants' arguments concerning, as well as the very real risks regarding, liability, causation, and disaggregation. Further, as a result of this

Settlement, thousands of Class members potentially will be eligible to benefit and receive some compensation for their losses and avoid the substantial risk of recovering nothing in the absence of this Settlement.

> 6.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High Risk, Contingent Securities Cases

73.     This litigation was undertaken by Lead Counsel on a wholly contingent basis. From the outset, Lead Counsel understood that it was embarking in complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of this Action and that funds were available to compensate staff and pay the considerable expenses that cases such as this entail. Indeed, because of the nature of a contingent practice where cases are predominantly complex cases lasting several years, not only do contingent-litigation firms have to pay regular overhead, but they also have to advance the expenses of the litigation. With a lag time of many years for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis. Moreover, this does not take into consideration the possibility of no recovery.

74.     From the outset, this Action presented significant risks and uncertainties that could have prevented any recovery. Plaintiffs' counsel who litigate in good faith and receive no fees whatsoever are often the most diligent members of the plaintiffs' bar. The fact that defendants and their counsel know that the leading members of the plaintiffs' bar are actually able to, and will, go to trial, even in high risk cases, gives rise to meaningful settlements in actions such as this. The losses suffered by plaintiffs' counsel in other actions where insubstantial settlement offers are rejected, and plaintiffs' counsel ultimately receive little or no fee, should not be ignored.

75.     Moreover, there have been many hard-fought lawsuits where, because of discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee to counsel.

76.     The adoption of the PSLRA has also greatly enhanced the risk of litigating securities fraud cases. Many post-PSLRA cases in this Circuit have been dismissed at summary judgment after thousands of hours have been invested in successfully opposing motions to dismiss and pursuing discovery. *See, e.g.*, *Beleson v. Schwartz*, 419 F. App'x 38 (2d Cir. 2011) (affirming district court's decision granting defendants' motion for summary judgment); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 2004 U.S. Dist. LEXIS 18580 (S.D.N.Y. Sep. 13, 2004) (granting summary judgment in favor of defendants).

77.     The risks of contingent litigation are also highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and efforts have been expended on the case. For example, the Supreme Court eliminated a cause of action based on aiding and abetting under Section 10(b) of the Exchange Act. *See Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994). As a result, many courts then dismissed long pending cases that otherwise stated a proper cause of action at the time they were brought. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011); *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).

78.     It takes diligent work by skilled counsel to develop the facts and theories that will survive the pleading stage and potentially succeed at summary judgment and trial. Because the fee to be awarded in this Action is entirely contingent, the only certainty from the outset was that there

would be no fee absent a successful result, and that such a result would be realized only after vigorous and intensive efforts.

79.     Lawsuits such as those described above are exceedingly expensive to litigate, and any fees awarded are used to fund enormous overhead expenses incurred during the course of many years of litigation, are taxed by federal, state, and local authorities, are used to pay the monthly salaries of the firms' attorneys and staff, and when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee award appears.

80.     Courts have repeatedly held that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations. The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). "Nothing in the PSLRA, we have previously noted, casts doubt on the conclusion 'that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses' – a matter crucial to the integrity of the domestic capital markets." *Id.* at 320 n.4. The SEC, a vital but understaffed government agency, does not have the budget or the resources to ensure complete enforcement of the securities laws. If this important policy is to be carried out, the courts should award fees which will adequately compensate plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of the situation.

## IX.     REIMBURSEMENT OF THE REQUESTED EXPENSES IS FAIR AND REASONABLE

81.     Lead Counsel also seeks reimbursement from the Settlement Fund of $110,000 for expenses reasonably and actually incurred in connection with its commencement, prosecution and

resolution of the claims asserted in the Action. Indeed, excluding the proposed awards that would go directly to two plaintiffs and one additional class representative, Lead Counsel's reasonably incurred expenses total $109,851.09, within the noticed $110,000 expense cap.

82.     From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and at the very least, would not recover anything until the Action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced to prosecute this Action. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.

83.     As attested to, Lead Counsel's expenses are reflected on the books and records maintained by Lead Counsel, which are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred. These expense items are billed separately by Lead Counsel, and such charges are not duplicative in its billing rates.

84.     The expense schedule below identifies the specific categories of expenses, *e.g.*, court fees, fees for experts, consultants and investigators, mediation costs, on-line legal and factual research, travel costs, reproduction costs, messenger and courier costs, and overnight mail costs. These expenses were reasonable and necessary to the prosecution and resolution of this Action, and are the type of expenses that counsel typically incur in complex litigation, and for which counsel are typically reimbursed when the litigation gives rise to a common fund.

| Category: | Total: |
|---|---|
| Computerized Legal Research | $2,241.04 |
| Experts/Consultants | $71,258.75 |
| Investigators | $10,287.50 |
| Mediation | $10,500.00 |
| Messengers/Couriers/Overnight Delivery | $187.03 |
| Photocopies and Printing | $3,482.00 |
| Filings Fees/PACER/PLSRA Notice | $480.00 |
| Transportation | $2,004.09 |
| Hotels | $8,416.00 |
| Meals | $994.68 |
| **Total Expenses Incurred by Lead Counsel:** | **$109,851.09** |

| Lead Plaintiff/Proposed Representative: | Proposed Award: |
|---|---|
| David Ducharme | $3,000.00 |
| Sam Snyder | $3,000.00 |
| Vianey Manriquez | $1,000.00 |
| **Total:** | **$7,000.00** |

85.     Of the total amount of expenses, $81,546.25, or approximately 70%, was expended on experts, consultants, and investigators. Lead Counsel worked extensively with experts, consultants, and investigators at different stages of the litigation. These experts, consultants, and investigators were utilized to assist in: (i) drafting allegations against Defendants; (ii) analyzing and preparing Plaintiffs' motion for class certification including an expert declaration regarding market efficiency; (iii) preparing for settlement negotiations; and (iv) developing the Plan of Allocation. Experts and consultants were retained in the complex and specialized areas of loss causation and damages. The following chart details the experts and consultants retained by Lead Counsel, as well as the expenses associated with each expert:

| Expert/Consultant/Investigator: | Area of Expertise and Brief Description of Work Performed: | Expense: |
|---|---|---|
| Global Economics Group | Economics; Expert Chad Coffman, CFA authored report on market efficiency, and his team assisted in formulating Plan of Allocation | $71,258.75 |
| On Point Investigations LLC | Investigations; Interviewed confidential witnesses, including former employees, substantiating Plaintiffs' allegations | $7,237.50 |
| Grapevine Asia Partners | International Investigations; Reviewed Chinese business filings and conducted interviews in Mandarin, expanding Plaintiffs' scienter allegations | $3,050.00 |

86.     The experts and consultants set forth above were essential to the overall prosecution and resolution of the Action. As indicated above, Global Economics Group and Chad Coffman, CFA were critical in supporting Plaintiffs' arguments regarding market efficiency with respect to Plaintiffs' motion for class certification, and invaluable in helping formulate the Plan of Allocation. Lead Counsel incurred $10,287.50 in expenses (approximately 9% of the total expenses) for investigative services provided by On Point Investigations LLC ("On Point") and Grapevine Asia Partners ("Grapevine"). On Point interviewed multiple former IPCI employees and provided Lead Counsel with memoranda detailing their investigation. This investigative work allowed Lead Counsel to allege information provided by six former employees who acted as confidential witnesses. Grapevine investigated Isa Odidi's business dealings in Asia, services which required fluency in the Mandarin language to both interview sources in Shanghai, China and review business registration filings at the PRC Administration of Industry and Commerce, online reports, and news articles published in China. This investigation allowed Lead Plaintiffs to make additional allegations regarding Odidi's scienter, a factor the Court specifically mentioned in its Order denying Defendant's Motion to Dismiss. *See* Dkt. No. 35 at 11.

87.     Further, Lead Counsel was required to travel in connection with its prosecution of Lead Plaintiffs' claims, and thus incurred the related costs of transportation, meals, and lodging. Included in Lead Counsel's expense request is $11,414.77 for such travel expenses necessarily incurred by Lead Counsel during the course of this Action.

88.     Lead Counsel also incurred $10,500.00 for mediation.[7] As detailed above, Lead Counsel engaged in a substantial mediation process that included a formal, day-long, in-person mediation session on August 1, 2019, presided over by an experienced mediator. Lead Counsel also submitted a detailed mediation statement and participated in several telephonic conferences with the mediator. Soon after this mediation, on August 9, 2019, the parties executed a memorandum of understanding setting forth the terms of this settlement. Thus, these mediation expenses were crucial to the resolution of the Action.

89.     The expenses detailed above and the other expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. Moreover, all of the expenses incurred by Lead Counsel were necessary to the successful prosecution and resolution of the claims against the Defendants. These expenses have been approved by Lead Plaintiffs.

90.     The Notice apprises potential Class Members that Lead Counsel will be seeking reimbursement of expenses in an amount not to exceed $110,000. As noted above, to date, there have been no objections to the request for reimbursement of expenses as set forth in the Notice. In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submits that the costs and expenses incurred by Lead Counsel up to, but not exceeding, $110,000, should be reimbursed

---

[7] Lead Counsel and Defendants each paid half of the mediation expenses.

from the Settlement Fund.

## X.   MODEST AWARDS REQUESTED FOR LEAD PLAINTIFFS AND PROPOSED CLASS REPRESENTATIVE

91.     Lead Plaintiffs David Ducharme and Sam Snyder and proposed Class Representative Vianey Manriquez seek a collective award in the amount of $7,000, $3,000 each for Lead Plaintiffs David Ducharme and Sam Snyder, and $1,000 for proposed Class Representative Vianey Manriquez. As detailed in their respective Declarations, attached hereto as Exhibits A, B, and C, Lead Plaintiffs David Ducharme and Sam Snyder, as well as proposed Class Representative Vianey Manriquez, have devoted time and effort to the prosecution of this Action.

92.     The requested awards are very modest and justified in light of their dedication and efforts spent working on the Action. Lead Plaintiffs David Ducharme and Sam Snyder: (i) reviewed IPCI's SEC filings; (ii) reviewed case-related documents and correspondence with Lead Counsel; (iii) reviewed and edited the Amended Complaint; (iv) commented on Defendants' motion to dismiss and their opposition thereto; and (v) gathered documents for production. Proposed Class Representative Vianey Manriquez spent time: (i) reviewing case-related documents and correspondence with Lead Counsel; (ii) reviewing Plaintiffs' motion for class certification and related briefing; and (iii) gathering documents for production.

93.     Given the contributions and the time and effort expended by Lead Plaintiffs David Ducharme and Sam Snyder and proposed Class Representative Vianey Manriquez, the requested awards are warranted and should be approved.

## XI.   CONCLUSION

94.     For the reasons set forth above and in the accompanying motions and supporting memoranda, I respectfully submit that: (a) the Settlement is fair, reasonable, and adequate and should be granted final approval; (b) the Plan of Allocation represents a fair method for allocating and distributing the Net Settlement Fund among eligible Class Members and should be approved;

(c) the Fee and Expense Application should be granted; and (d) the Award to Lead Plaintiffs and Proposed Class Representative should be granted.

95.    I declare under penalty of perjury of the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed this 20th day of November, 2020 at Scarsdale, New York.

*/s/ Kim E. Miller*
Kim E. Miller